## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF NEW HAMPSHIRE

Darren Starr

     v.                               Civil No. 09-cv-440-JL

Greg Moore, et al.[1]

## REPORT AND RECOMMENDATION

Darren Starr has filed a complaint (document no. 1) pursuant to 42 U.S.C. § 1983 alleging that his rights under the First and Eighth Amendments to the United States Constitution, and under state law, have been violated by the defendants, all employees of the New Hampshire Department of Corrections ("NHDOC"). Because Starr is incarcerated, the matter is before me for preliminary review to determine, among other things, whether it states any claim upon which relief might be granted. See 28 U.S.C. § 1915A; United States District Court District of New Hampshire Local Rule ("LR") 4.3(d)(2).

---

[1]All of the defendants named are employees of the New Hampshire Department of Corrections ("NHDOC"). In addition to Moore, who is a Chef at the Northern New Hampshire Correctional Facility ("NCF"), Starr has named Corrections Officer ("C.O.") Bungay, Richard Jacobetz, C.O. Fullen, C.O. Dan Millis, NCF Warden Larry Blaisdell, NHDOC Deputy Commissioner Christopher Kench, NCF Unit Manager Robert Thyng, Leo Dussault, and NCF Mailroom Officer Jessica Riendeau as defendants to this action.

<u>Standard of Review</u>

Under this Court's local rules, when an incarcerated person commences an action pro se and in forma pauperis, the Magistrate Judge conducts a preliminary review.  LR 4.3(d)(2).  In conducting the preliminary review, the Court construes all of the factual assertions in the pro se pleadings liberally, however inartfully pleaded.  <u>See</u> <u>Erickson v. Pardus</u>, 551 U.S. 89, 94 (2007) (per curiam) (following <u>Estelle v. Gamble</u>, 429 U.S. 97, 106 (1976), to construe pro se pleadings liberally in favor of the pro se party).  "The policy behind affording pro se plaintiffs liberal interpretation is that if they present sufficient facts, the court may intuit the correct cause of action, even if it was imperfectly pled."  <u>Ahmed v. Rosenblatt</u>, 118 F.3d 886, 890 (1st Cir. 1997); <u>see also</u> <u>Castro v. United States</u>, 540 U.S. 375, 381 (2003) (courts may construe pro se pleadings to avoid inappropriately stringent rules and unnecessary dismissals).  This review ensures that pro se pleadings are given fair and meaningful consideration.

To determine if a pro se complaint states any claim upon which relief could be granted, the Court must consider whether the complaint, construed liberally, <u>Erickson</u>, 551 U.S. at 94, "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"

2

Ashcroft v. Iqbal, ___ U.S. ___, ___, 129 S. Ct. 1937, 1949
(2009) (citation omitted).  "A claim has facial plausibility when
the plaintiff pleads factual content that allows the court to
draw the reasonable inference that the defendant is liable for
the misconduct alleged."  Id.  Inferences reasonably drawn from
the plaintiff's factual allegations must be accepted as true, but
the Court is not bound to credit legal conclusions, labels, or
naked assertions, "devoid of 'further factual enhancement.'"  Id.
(citation omitted).  Determining if a complaint sufficiently
states such a claim for relief is a "context-specific task that
requires the reviewing court to draw on its judicial experience
and common sense."  Id. at 1950 (citation omitted).

Discussion[2]

I.   First Amendment Reading Materials Claim

     A.   Facts

     Darren Starr is an inmate in the custody of the NHDOC.
Although he is presently incarcerated at the New Hampshire State
Prison for Men, at all times relevant to the claims raised here,
he was housed at the NHDOC's Northern New Hampshire Correctional

---

[2]The claims, as identified herein, will be considered to be
the claims raised in the complaint for all purposes.  If Starr
disagrees with the claims identified, he must do so by properly
objecting to this Report and Recommendation or properly moving to
amend his complaint.

Facility ("NCF").  In January 2007, Starr asked a family member to purchase books, to be sent to Starr at the prison, on the subjects of acupuncture and qi.  Qi is a life force or vital energy believed by some to circulate through the body.  The practice of acupuncture is based on the principle that the unimpeded and balanced circulation of qi through pathways in the body is essential to good health.  Starr's relative purchased two books, "Fundamentals of Chinese Acupuncture," and "The Color Atlas of Acupuncture," and had them sent to Starr through an authorized bookseller.[3]

When the books initially arrived at the prison, they were forwarded to Starr at NCF by Jessica Riendeau, the mailroom officer.  At NCF, before giving hte books to Starr, C.O. Beckwith questioned the suitability of the books for an inmate, and returned them to Riendeau with a request that the books be submitted to the NHDOC's Literary Review Committee ("LRC") for a determination of whether or not the books were appropriate for an inmate to possess.  The LRC is a group of NHDOC employees, comprised of security, education, and mental health staff members that review written material sent into the prison to determine

---

[3]The NHDOC does not allow inmates to receive books or magazines from private individuals or family members.  The inmate must receive such publications directly from the publisher or an authorized bookseller.

whether it may be released to the inmate to whom it was sent, or whether it should be withheld as containing material or content deemed inappropriate for introduction into a prison setting.

On February 23, 2007, Starr learned that his two acupuncture books had been rejected by the LRC because they were deemed to "encourage[] physical violence." On February 28, 2007, Starr appealed the rejection of the books. His appeal was denied.

On March 6, 2007, Starr submitted a first level grievance regarding the rejection of his books and denial of his appeal. C.O. Dan Millis denied the grievance. On March 12, 2007, Starr submitted a second level grievance to NCF Warden Larry Blaisdell which was also denied. On March 30, 2007, Starr submitted his third level grievance to the office of the NHDOC Commissioner. Deputy Commissioner Christopher Kench also denied the grievance. The substance of Starr's appeal from the LRC decision and his ensuing grievances was that Starr believed that the acupuncture books promote health and healing, that they in no way instruct readers in or encourage the use of violence. Further, Starr argued that to the extent the LRC was concerned that the acupuncture books contained anatomical information that might be misused in a prison setting by inmates intent on harming one another, the prison already allows inmates to receive books about human anatomy.

In Millis's response to Starr's March 6, 2007 grievance,
Millis expressed concern, not with the depictions of anatomy in
the rejected acupuncture books, but with the fact that the book
specifically discusses and depicts vital pressure points and
nerve bundles in the human body, and that if such information was
misused by an inmate, the result could be permanent injury or
death to another person.  The denial of the grievance and reasons
therefore were affirmed by Blaisdell and Kench in response to
Starr's second and third level grievances.

    B.    Analysis[4]

    Incarceration brings about necessary limits on certain
aspects of an inmate's constitutional rights.  Turner v. Safley,
482 U.S. 78, 84 (1987).  The First Amendment "embraces the right
to distribute literature, and necessarily protects the right to
receive it."  Martin v. City of Struthers, 319 U.S. 141, 143
(1943).  The First Amendment rights of prisoners, however, may be
abridged to the extent that the exercise of those rights is

---

    [4]Starr's pleadings indicate that he grieved an issue to the
NCF and NHDOC administration regarding the alleged violation of
his procedural due process rights occasioned by the notice
procedures employed at the NHDOC in the review and withholding of
the acupuncture books.  Starr has specifically identified the
claims he seeks to address in this suit, and he has not included
this due process claim in this action.  I presume the exclusion
of the due process claim was intentional and I will therefore not
construe the complaint to include that claim.

"inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." Jones v. N.C. Prisoners' Labor Union, Inc., 433 U.S. 119, 129 (1977) (internal citations omitted).

The Supreme Court has set out a four-factor test for courts to use in determining whether a particular prison policy serves legitimate penological objectives: (1) whether the regulation is rationally related to a legitimate and neutral government objective; (2) whether the inmate has other avenues available to exercise the right in question; (3) the impact that accommodating the asserted right will have on prison guards and other prisoners, as well as on the allocation of prison resources; and (4) whether there is any ready alternative to the regulation that will fully accommodate the prisoners' rights at de minimus cost to valid penological interests, indicating that the regulation is an exaggerated response by prison officials.  See Overton v. Bazzetta, 539 U.S. 126, 132 (2003); Turner, 482 U.S. at 89-91. Applying this test, I will examine the regulations at issue here to determine whether or not Starr has stated sufficient facts to support an actionable claim alleging the deprivation of his First Amendment rights.

Starr's right to receive mail and publications has unquestionably been burdened by the defendants' acts in rejecting

acupuncture books sent to him at the prison.  Because the
rejection of the books impinged Starr's First Amendment right to
receive reading materials, the regulation employed to deny Starr
his books must be reasonably related to a legitimate penological
objective.

There is no doubt that monitoring and some regulation of
information that flows into the prison is a legitimate
penological enterprise, to the extent that such monitoring and
regulation serves to protect institutional security, or to
prevent the introduction of contraband, or illegal, disruptive,
or dangerous information into the prison.  Thornburgh v. Abbott,
490 U.S. 401, 415 (1989) (citing Pell v. Procunier, 417 U.S. 817,
823 (1974)).  This is not to say, however, that the standard
leaves the courts without power to control a prison regulation's
overbreadth.  The reasonableness standard set forth in Turner, to
be utilized by the Court in evaluating the relationship of a
regulation to a legitimate penological objective, provides:

> if . . . satisfied by nothing more than a 'logical
> connection' between the regulation and any legitimate
> penological concern perceived by a cautious warden, it
> is virtually meaningless.  Application of the standard
> would seem to permit disregard for inmates'
> constitutional rights whenever the imagination of the
> warden produces a plausible security concern and a
> deferential trial court is able to discern a logical
> connection between that concern and the challenged
> regulation.

<u>Turner</u>, 482 U.S. at 100-01 (Stevens, J.) (concurring in part and dissenting in part) (citation omitted) (emphasis in original). Accordingly, <u>Turner</u> must be read to require some objectively reasonable connection be able to be drawn between a prison rule and the legitimate concern to which the rule is addressed.

Here, the reason for rejection Starr received was that the acupuncture books in question "encourage[d] physical violence." Doubting the validity of this reason, Starr challenged the finding through prison administrative processes.  During the course of this process, prison administrators revealed the specific basis upon which they found that the books presented a threat to inmate safety and institutional security.  Millis, in his response to Starr's grievance, stated that the discussion in the acupuncture books of the location and function of certain pressure points and nerve bundles could be used to guide an inmate to cause permanent injury or death to another inmate or to a prison staff member.  Starr argues that the purpose of this information in the books is to promote health and healing, not to incite anyone to violence.  The prison administration's position, however, was that this information could be misused and cause a breach of safety and security within the prison.  The prison administrators' responses demonstrated that the withholding of the books was based on a legitimate security concern, and also

showed that the prison considered the specific information
contained in the two acupuncture books in finding the material to
be unsuitable.  I find that the prison's concerns are reasonable
and legitimate, and as such, may provide the basis for the
regulation and restriction of incoming reading materials at the
prison.

Starr next argues, however, that the prison's response to
the information in the book was exaggerated because other books
containing information on human anatomy have the potential for
misuse and yet are allowed in the prison.  The appropriateness of
materials other than those sent in to Starr is not presently
before the Court.  Further, the prison administrators did not
point solely to the anatomical information in the acupuncture
books as objectionable.  Instead, the prison officials pointed
specifically to the identification of the location and function
of pressure points and nerve bundles contained in the acupuncture
books.  Nothing in the complaint suggests that this information
was already available in written materials in the prison, or that
other inmates were allowed to receive this information in another
publication.  Accordingly, the acupuncture books can be
distinguished from other anatomy books and rejected for entry
into the prison for reasons arising out of that distinction.

Starr asserts that he has no other means to exercise his

right to read acupuncture books or other information about qi at
the prison.  While that may be true, this burden on Starr's right
to certain reading materials is reasonable under the
circumstances.  Starr has not described an exaggerated response
by the prison administration.  To the contrary, it appears that
the prison took a measured and reasonable approach to the
possibility of introducing materials into the prison and found
through that process that the information in the books has the
potential for enabling serious or deadly consequences if misused.
While it may be the case that the prison could have allowed Starr
to have the books and provided extra security to insure the
safety of the institution by ensuring that Starr would not have
the opportunity to misuse the information therein.  The prison
may make decisions, however, about how to distribute security
resources that may burden Starr's ability to possess certain
reading materials.  This Court must accord prison administrators
significant deference in defining legitimate goals for the
corrections system, and for determining the best means of
accomplishing those goals.  See Overton, 539 U.S. at 132; Pell,
417 U.S. at 826-27.  The Court will not insert itself into such a
decision where, as here, nothing in the complaint indicates that
the prison acted unreasonably.  I therefore recommend dismissal
of Starr's First Amendment claim based on the rejection of his

11

acupuncture books.  I also recommend dismissal of defendants
Bungay, Jacobetz, Fullen, Millis, Riendeau, and Dussault from
this action, as all of them are identified in the complaint as
defendants only to the claim in this action related to the denial
of the acupuncture books.

II.   Endangerment, Failure to Protect, and Retaliation Claims

     A.   Facts

In early January 2005, someone employed at NCF proposed that
on Saturdays and Sundays, the inmates receive two meals, brunch
and dinner, instead of three meals.  Starr filed a grievance
objecting to the proposed 2-meal weekend schedule, which was
denied.  In February 2005, Starr submitted a second level
grievance to the NCF Warden regarding the 2-meal weekend
schedule, which had by then been implemented.

On March 22, 2005, during a preliminary injunction hearing
on another matter, Starr brought the matter of the 2-meal policy
to the attention of Magistrate Judge Muirhead.  At the hearing,
Judge Muirhead noted the illegality of the policy, and ordered
NCF to discontinue the practice of giving inmates only two meals
per day on weekends.  The NCF administration complied with the
Judge's order.  In addition to discontinuing the practice of
offering only two meals per day on the weekends, however, NCF
administration also discontinued its holiday meal schedule.

12

Prior to March 2005, on holidays, NCF served inmates a large
brunch with extra food, and then later served a special holiday-
themed meal, also containing more food than is usually provided.
While Starr had complained about being served two meals on the
weekends, he had not complained about the holiday meal schedule.

On July 4, 2005, NCF served its regular three meals, and did
not serve any special holiday-themed meal.  A number of inmates
complained to the kitchen staff about the lack of a holiday meal.
A member of the kitchen staff told the inmates that there was no
special meal because Starr had sued the prison over the holiday
meals, and that if they had any problem with not having a holiday
meal, they should take it up with Starr.  As a result, Starr
states that he had two different inmates confront him, and was
involved in two fights resulting from this incident.  In November
2005, at Thanksgiving, Starr was again forced to fight because,
again, some member of the kitchen staff received an inmate
complaint about not having a holiday meal and told the
complaining inmate to address the issue to Starr.

In January 2006, Starr was confronted by angry inmates
because the bag lunches ordinarily handed out on Super Bowl
Sunday had been cancelled, and again Starr had been blamed by
name by someone on the kitchen staff.  Starr was again forced to
fight over the cancellation of the Super Bowl Sunday meals.

13

Starr was told by other inmates that Joe Pelletier, a member of the kitchen staff, had been directing angry inmates to confront Starr with any complaints about cancelled holiday meals.  Starr filed a grievance with Unit Manager Robert Thyng complaining about Joe Pelletier's actions.  Thyng investigated the grievance. Pelletier denied making statements about Starr and therefore no further action was taken.

In November 2006, at Thanksgiving, Cpl. Brian Gosselin was on duty in the dining hall and told inmates that the Thanksgiving holiday meal had been cancelled due to litigation initiated by Starr.  Starr told Sgt. Newton what Gosselin said.  Newton agreed with Starr that the comments were inappropriate and said he would speak to Gosselin.  Newton met with Gosselin and then spoke to Starr.  Newton told Starr that Gosselin admitted what he had said, and that Newton had ordered Gosselin not to engage in that behavior again.  Although Gosselin had been addressed by his superior, the following day Starr was forced to fight with an inmate who was responding to Gosselin's earlier comments about Starr.

In December 2006, at Christmas, a member of the kitchen staff told an inmate that the Christmas holiday meal was cancelled because of Starr's litigation.  On December 26, 2006, Starr was again forced to fight with an inmate who had heard

14

someone in the kitchen staff blame Starr for the lack of a holiday meal.

On July 4, 2007, inmates complained to the kitchen staff that the breakfast they received that day was of poor quality. NCF Chef Greg Moore told numerous inmates that the poor meal was due to Starr's lawsuit against the prison, as was the lack of a holiday meal on that day.  That morning, Starr went to the kitchen to confront Moore.  Moore admitted to making those comments and stated that he believed it was common knowledge that the holiday meals were no longer offered because of a lawsuit filed by Starr.  Moore admitted to Starr that he had previously made similar comments to inmates who complained about the cancellation of special holiday meals.  Moore acknowledged that it was a mistake to have made those comments, apologized to Starr, and promised to stop making the statements.  Despite the apology, in the days following the July Fourth holiday, Starr was threatened by two other inmates and fought with a third as a result of what they had heard about Starr's responsibility for the cancellation of the holiday meal.

Having finally identified Moore as the individual telling inmates that Starr was responsible for the cancellation of holiday meals, Starr filed a first level grievance with Thyng on July 5, 2007, complaining about Moore's conduct and its resulting

15

harm to Starr.  Thyng found that Moore had acknowledged and apologized for his error.  Thyng stated in his response to Starr that he would discuss the issue with Moore further.

On July 9, 2007, Starr filed a second level grievance with Blaisdell.  Blaisdell acknowledged what had occurred and condemned the comments made by Moore as inappropriate.  Blaisdell stated in his response to Starr that the issue with Moore would be handled, going forward, as a personnel matter, and that it shouldn't be a problem again.

On July 19, 2007, Starr filed a third level grievance with the NHDOC Commissioner's Office.  In that grievance, Starr specifically requested that Moore be fired.  Kench responded to Starr that the matter would be handled as a personnel matter, and that, as such, any action taken to would not be disclosed to Starr.  Kench did indicate, however, that firing Moore for his actions would not be practical, and "would not be supported by the Public Labor Relations Board."

Starr now alleges that Moore's actions in sending angry inmates to confront Starr were retaliation for Starr's complaints about and effective termination of the two-meal weekend policy that NCF staff had implemented.  Moore's actions, and the failure of Moore's supervisors to take meaningful action in response to Starr's grievance, Starr asserts, violated his right to be safe in prison.

16

B.    Analysis

1.    Endangerment and Failure to Protect Claims

"[T]he treatment a prisoner receives in prison and the
conditions under which he is confined are subject to scrutiny
under the Eighth Amendment." Helling v. McKinney, 509 U.S. 25,
33 (1993); see Giroux v. Somerset County, 178 F.3d 28, 31 (1st
Cir. 1999).  The Supreme Court has adopted a two-part test for
reviewing claims under the Eighth Amendment's cruel and unusual
punishment clause. See Farmer v. Brennan, 511 U.S. 825, 834
(1994); Helling, 509 U.S. at 25; Hudson v. McMillian, 503 U.S. 1,
7 (1992).  The safety and security of all prisoners is protected
by the Eighth Amendment to the Constitution. See DeShaney v.
Winnebago County Dep't of Soc. Servs., 489 U.S. 189, 190 (1989);
Youngberg v. Romeo, 457 U.S. 307, 315-16 (1982).

Corrections officials have a duty to protect prisoners from
violence at the hands of other prisoners, Farmer v. Brennan, 511
U.S. 825, 833 (1994), and must "take reasonable measures to
guarantee the safety of the inmates" in their care. Hudson v.
Palmer, 468 U.S. 517, 526-27 (1984).  An inmate does not have to
wait until he or she is actually assaulted before obtaining
relief. See Benefield v. McDowall, 241 F.3d 1267, 1271-72 (10th
Cir. 2001) (citing Woodhous v. Virginia, 487 F.2d 889, 890 (4th
Cir. 1973) ("A prisoner has a right, secured by the eighth and
fourteenth amendments, to be reasonably protected from constant

17

threat of violence and sexual assault by his fellow inmates, and he need not wait until he is actually assaulted to obtain relief")).  In claims, such as the one raised in this action, however, based on the alleged failure to prevent harm, the first prong of review in an Eighth Amendment claim requires that the prison conditions complained of must, considered objectively, pose "a substantial risk of serious harm."  <u>Farmer</u>, 511 U.S. at 834, 836. "This determination requires the fact-finder to consider the seriousness of the potential harm and the likelihood that such injury to health will actually be caused by exposure [to the danger]."  <u>Pack v. Artuz</u>, 348 F. Supp. 2d 63, 79 (S.D.N.Y. 2004).  To violate the Eighth Amendment, the conditions presenting the risk of future harm "must be 'sure or very likely to cause serious illness and needless suffering,'" and give rise to 'sufficiently imminent dangers.'"  <u>Baze v. Rees</u>, 553 U.S. 35, 50 (2008) (quoting <u>Helling</u>, 509 U.S. at 33-35).

To state a constitutional claim that defendant Moore endangered him, Starr must allege that Moore was aware of and deliberately indifferent to a serious risk to his safety.[5]  <u>See</u> <u>Burrell v. Hampshire County</u>, 307 F.3d 1, 7 (1st Cir. 2002).  To

---

[5]Starr has stated that in November 2006, C.O. Gosselin engaged in the same type of conduct that Moore is sued for here. I assume that Starr has intentionally not named Gosselin as a defendant to this action, and I will construe the endangerment claim as raised only against Moore.

obtain the protection of the Eighth Amendment, an inmate must show that the potential harm he has been exposed to poses "an unreasonable risk of serious damage to his future health." Helling, 509 U.S. at 35.  An inmate must also show that he is, in fact, being exposed to an existing unreasonable hazard.  Id. at 35-36 (no Eighth Amendment claim where inmate is not presently exposed to actual danger, but only speculates as to potential danger he might be exposed to in the future).  Here, Starr has demonstrated that angry inmates were pointed in his direction as the source of their complaint, and advised by prison staff to take their frustration directly to Starr.  It is unreasonable for any prison employee in this situation to believe that the angry inmates were likely to resolve their dissatisfaction with Starr with peaceful discourse.  Even if not all inmates resort to violence to vent their frustrations, it is a foreseeable and likely result of anger between inmates in a prison setting. Accordingly, I find that Moore's actions created a serious risk of harm to Starr.

The second prong of the review of an Eighth Amendment claim requires examination of the subjective intent of the defendant; it requires that the prison official defendant acted with a "sufficiently culpable state of mind," and acted with deliberate indifference to an inmate's health or safety.  Farmer 511 U.S. at 834.  In the context of a failure to protect claim, "a prison

19

official has sufficient culpable intent if he has knowledge that an inmate faces a substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate the harm." Pack, 348 F. Supp. 2d at 88 (citing Hayes v. N.Y. City Dep't of Corrs., 84 F.3d 614, 620 (2d Cir. 1996)).

Starr has stated that Moore disregarded the serious risk to Starr's safety that occurred when he sent angry inmates Starr's way. The facts alleged by Starr are sufficient to assert a claim that defendant Moore violated Starr's Eighth Amendment right to safety in prison. In an Order issued simultaneously with this Report and Recommendation (hereinafter the "Simultaneous Order") I will direct that the endangerment and failure to protect claims be served on Moore.

        2. Retaliation Claims

Starr alleges that Moore's actions in advising angry inmates that he was responsible for their loss of special holiday meals, which resulted in Starr being placed in danger, as well as the failure of prison officials to adequately protect Starr, constituted unconstitutional retaliation for Starr's exercise of his First Amendment right to complain about prison conditions through administrative and judicial channels. "[G]overnment actions, which standing alone do not violate the Constitution, may nonetheless be constitutional torts if motivated in substantial part by a desire to punish an individual for exercise

20

of a constitutional right." Mitchell v. Horn, 318 F.3d 523, 530 (3d Cir. 2003); see Oropallo v. Parrish, No. 93-1953, 1994 WL 168519, at *3 (D.N.H. May 5, 1994), aff'd, 23 F.3d 394 (1st Cir. 1994) (citing Ferranti v. Moran, 618 F.2d 888, 892 n.4 (1st Cir. 1980) ("[A]ctions otherwise supportable lose their legitimacy if designed to punish or deter an exercise of constitutional freedoms.") (citation omitted)); see Goff v. Burton, 7 F.3d 734, 738 (8th Cir. 1993) (prison officials cannot lawfully impose a disciplinary sanction against a prisoner in retaliation for the prisoner's exercise of his constitutional right).  On the other hand, as noted above, prison officials may make policy that is reasonably related to legitimate penological interests, even at the expense of certain constitutional rights.  See Beard v. Banks, 548 U.S. 521, 528-29 (2006) (citing Turner, 482 U.S. at 89-90).

In order to state a claim for retaliation for exercising his First Amendment rights, Starr must allege: (1) the conduct which led to the alleged retaliation was protected by the First Amendment, (2) some adverse action at the hands of the prison officials, and (3) a causal link between the exercise of his First Amendment rights and the adverse action take.  See Price v. Wall, 464 F. Supp. 2d 90, 96 (D.R.I. 2006); see also LaFauci v. N.H. Dep't of Corr., No. Civ. 99-597-PB, 2005 WL 419691, at *7

(D.N.H. Feb. 23, 2005) (Unpublished Order).  I consider each of these elements of a retaliation claim in turn.

> a.   Petitioning the Government for Redress of Grievances/Maintaining Right of Access to the Courts

The right to petition the government for a redress of grievances has been characterized as "among the most precious of the liberties safeguarded by the Bill of Rights."  United Mine Workers v. Ill. State Bar Ass'n, 389 U.S. 217, 222 (1967).  In the prison context, this right means that inmates must be "permit[ted] free and uninhibited access . . . to both administrative and judicial forums for the purpose of seeking redress of grievances against state officers."  Turner, 482 U.S. at 84 (citing Johnson v. Avery, 393 U.S. 483 (1969)); Sostre v. McGinnis, 442 F.2d 178, 200 (2d Cir. 1971) (en banc).

Starr has alleged that he exercised his First Amendment right to petition the government for a redress of grievances by engaging in both an administrative grievance procedure and in federal civil litigation against the prison and its employees regarding the two-meal per day weekend policy proposed and implemented by NCF staff.  Because Starr's administrative grievance and judicial litigation activities are protected by the First Amendment as an exercise of his right to petition the government to redress grievances, Starr has alleged sufficient

facts to satisfy the first requirement for stating a retaliation claim.

                          b.    Adverse Action

      To state an adverse action, plaintiff must allege that the defendants subjected him to "conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her Constitutional rights." Dawes v. Walker, 239 F.3d 489, 492 (2d Cir. 2001), overruled in part on other grounds by Phelps v. Kapnolas, 308 F.3d 180, 187 n.6 (2d Cir. 2002); see Thaddeus-X v. Blatter, 175 F.3d 378, 398 (6th Cir. 1999).  Even if a particular inmate is not chilled in his expression, a claim for retaliation may still arise if the retaliatory behavior alleged is objectively sufficient and onerous to deter an ordinary person from exercising his rights.  See Gay v. Shannon, No. Civ.A. 02-4693, 2005 WL 756731, *8 (E.D.Pa. 2005) (citing Allah v. Seiverling, 229 F.3d 220, 225 (3d Cir. 2000)).  Starr alleges that the defendants are responsible for sending angry inmates to confront Starr directly as the object of their anger.  Starr credibly argues that in a prison context, any staff member or administrator should be aware that such an act is likely to place Starr at a risk of harm from the angry inmates.  I can easily find that an inmate of ordinary firmness might well be chilled in his efforts to litigate his grievances against the prison, both

administratively and in the courts, if his efforts to do so were
expected to be rewarded with prison staff encouraging inmates to
express their anger directly to Starr, which any reasonably alert
inmate would know would jeopardize his safety.  Accordingly, I
find that Starr has satisfied the "adverse act" requirement for
stating a retaliation claim against Moore.

> c.   Retaliatory Action Caused by First Amendment
>      Violation

Circumstantial evidence is often enough to support a claim
that an adverse action was taken with retaliatory intent, as
intentions are often difficult to prove through direct evidence.
See Beauchamp v. Murphy, 37 F.3d 700, 711 (1st Cir. 1994);
Ferranti, 618 F.2d at 892 (chronology of events provided support
for inference of retaliation); McDonald v. Hall, 610 F.2d 16, 18
(1st Cir. 1979) (same); see also Woods v. Smith, 60 F.3d 1161,
1166 (5th Cir. 1995).  Here, Starr asserts that the adverse acts
alleged were motivated by Moore retaliating against Starr for the
termination of the two-meal weekend plan.  Starr has not directly
asserted that Moore made any specific reference to his own
feelings about the termination of the two-meal plan.  However,
for purposes of preliminary review, I will presume that prison
employees, including Moore, were in favor of the plan, as
evidenced by the fact that the plan was implemented over inmate
objections.  The only reason the two-meal plan was terminated

appears to be Starr's litigation.  It is not unreasonable to find that Starr may be able to demonstrate that Moore's acts in sending angry inmates to Starr were motivated by animus caused by the termination of the two-meal policy.

I find that Starr has sufficiently stated that the actions taken by Moore that violated his Eighth Amendment were taken in retaliation for Starr's exercise of his First Amendment rights to allow the retaliation claims raised to proceed.  Accordingly, in my Simultaneous Order, I will direct service of the retaliation claim against Moore.

C.   Defendants Thyng, Blaisdell and Kench

Starr has sued Thyng, Blaisdell, and Kench, alleging that they failed to adequately protect him.  Starr has alleged that he grieved the July 2007 issues with Moore to Thyng, Blaisdell, and Kench.  All three of those defendants acknowledged that Starr had a valid grievance and agreed to address it.  While Starr did not agree with Kench's decision not to fire Moore, Starr has not alleged that he had any constitutional right to Moore's termination and I find that he has none.  In January 2006, Starr alleges that he filed a grievance regarding Joe Pelletier with Thyng.  Again, however, Starr's assertions demonstrate that Thyng addressed Starr's concerns as they were presented to him at the time.

25

Starr has not alleged that he has not been protected from harm since the July 2007 incident with Moore, or that he has since been further endangered.  Starr has not stated any facts from which I can reasonably infer a claim against Thyng, Blaisdell, or Kench for failing to protect Starr.  Further, because Starr has not alleged that these defendants took any adverse action against him, as discussed above, he cannot allege that they retaliated against him.

To the extent he intends to sue Thyng, Blaisdell, and Kench for Moore's acts in their supervisory capacities, Starr's complaint fails to assert a claim.  Supervisors may be held liable under § 1983 only for their own acts.  See Ashcroft, ___ U.S. at ___, 129 S. Ct. at 1949 (no supervisory liability in § 1983 actions based on respondeat superior).  The First Circuit, following Ashcroft, held that:

> [S]upervisory liability lies only where an affirmative link between the behavior of a subordinate and the action or inaction of his supervisor exists such that the supervisor's conduct led inexorably to the constitutional violation.  Further, supervisory liability under a theory of deliberate indifference will be found only if it would be manifest to any reasonable official that his conduct was very likely to violate an individual's constitutional rights.

Maldonado v. Fontanes, 568 F.3d 263, 275 (1st Cir. 2009) (internal quotations and citations omitted).  Here, Starr has not alleged, and I decline to infer, any facts specifically

identifying any acts or omissions on the part of Thyng, Blaisdell, or Kench that damaged or injured Starr in any way. Starr has not, therefore, sufficiently stated a federal constitutional claim upon which relief might be granted against Thyng, Blaisdell, or Kench, and I recommend that they be dismissed from this action.

III. <u>State Law Tort Claim</u>

Starr alleges that defendants are liable to him under state law for the intentional infliction of emotional distress.  In order to consider the state law claims, the Court would have to exercise its supplemental jurisdiction under 28 U.S.C. § 1367. Section 1367 allows federal district courts to consider state law claims in a civil action where the claims "are so related to claims in the action within [the court's] original jurisdiction that they form part of the same case or controversy."  I find that the state law claim for the intentional infliction of emotional distress raised here arises out of the same case or controversy as the endangerment, failure to protect and retaliation claims that I have approved to proceed against Moore. Accordingly, I find the state law intentional infliction of emotional distress claim can also proceed against Moore, and I will so direct in my simultaneous Order.

## Conclusion

For the foregoing reasons, I recommend that the First Amendment claim alleging a violation of Starr's right to receive reading materials be dismissed.  I also recommend dismissal of defendants Bungay, Jacobetz, Fullen, Millis, Riendeau, Dussault, Thyng, Blaisdell, and Kench from this action.  In my simultaneous Order, I direct service of Starr's Eighth Amendment claims alleging endangerment and failure to protect, his retaliation claims, and his state law claims be served on defendant Moore.

Any objections to this Report and Recommendation must be filed within fourteen days of receipt of this notice.  Failure to file objections within the specified time waives the right to appeal the district court's order.  See Unauth. Practice of Law Comm. v. Gordon, 979 F.2d 11, 13-14 (1st Cir. 1992); United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986).

_____
Landya B. McCafferty
United States Magistrate Judge

Date:   July 27, 2010

cc:   Darren Starr, pro se

LM:jba

28